CLERK'S OFFICE U.S. DISTRICT COURT
AT ROANOKE VA. - FILED

MAR 18 2008

JOHN F. CORCORAN, CLERK
BY: /s/ DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| ERIC J. THOMAS, ) | | |
|     Plaintiff, ) | Civil Action No. 7:07CV059 | |
| ) | | |
| v. ) | **MEMORANDUM OPINION** | |
| ) | | |
| MICHAEL ASTRUE, ) | By: | Hon. Michael F. Urbanski |
| COMMISSIONER OF SOCIAL ) | | United States Magistrate Judge |
| SECURITY, ) | | |
|     Defendant. ) | | |

    Plaintiff Eric J. Thomas ("Thomas") brings this action for review of the Commissioner of Social Security's ("Commissioner") decision denying his claim for Disability Insurance Benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383 ("Act"). This case is before the court on cross motions for summary judgment and was transferred to the undersigned Magistrate Judge on March 5, 2007, pursuant to 28 U.S.C. § 636(c)(2). Following the filing of the administrative record and briefing, the court heard oral argument on January 29, 2008. As such, the case is now ripe for decision. Based on the filed briefs, oral argument, and a thorough review of the record and relevant case law, the decision of the Commissioner is affirmed as it was founded on correct legal principles and supported by substantial evidence.

I.

    Judicial review of a final decision regarding disability benefits under the Act is limited to determining whether the administrative law judge's ("ALJ") findings "are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990) (citing 42 U.S.C. § 405(g) (2000)). Accordingly, the reviewing court may not substitute its judgment for that of the ALJ, but instead, must defer to the ALJ's

determinations if they are supported by substantial evidence. Id. Substantial evidence is such relevant evidence which, when considering the record as a whole, might be deemed adequate to support a conclusion by a reasonable mind. Richardson v. Perales, 402 U.S. 389, 401 (1971). Substantial evidence consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. Shivley v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). If such substantial evidence exists, the final decision of the Commissioner must be affirmed. Hays, 907 F.2d at 1456; Laws, 368 F.2d at 642.

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are "under a disability." 42 U.S.C. § 423(a) (2000). Disability is defined in 42 U.S.C. § 323(d)(1)(A) (2000) as:

> [The] inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least twelve continuous months.

The Commissioner uses a five-step process in evaluating DIB claims. See 20 C.F.R. § 404.1520. See also Heckler v. Campbell, 461 U.S. 458, 460-62 (1983); Hall v. Harris, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of a listed impairment; (4) can return to his past relevant work; and (5) if not, whether he or she can perform other work. See 20 C.F.R. § 404.1520. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. See 20 C.F.R. § 404.1520(a).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a

prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. See 42 U.S.C.A. § 423(d)(2); McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983); Hall, 658 F.2d at 264-65; Wilson v. Califano, 617 F.2d 1050, 1053 (4th Cir. 1980). "In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the Secretary." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996); See also Mastro v. Apfel, 270 F.3d 171 (4th Cir. 2001).

## II.

Born on November 22, 1972, Thomas completed high school through the twelfth grade and vocational training in automotive repair. (Administrative Record [" R."] at 37, 91) Thomas' previous employment included automotive repair, retail, and demolition work. (R. 84, 85) Thomas completed a ten month training program in auto body repair in September, 2002 and worked in that field from December, 2002 to March, 2003. (R. 23) Thomas filed an application for DIB and SSI in early 2004, alleging that he had become disabled on December 31, 2000 due to nerve damage in his neck, shoulder and hand, loss of use of his left arm, arthritis in his left leg and eye problems. (R. 83-84)

Though relatively young, Thomas has experienced a number of traumatic injuries. At seven, he shattered his femur in a bicycle accident. (R. 407) In July 16, 2000, Thomas drove a motorcycle through a crowd and struck two trees at a high rate of speed. (R. 124) The impact knocked Thomas unconscious and he sustained injuries to his left arm and wrist, requiring

3

surgery.[1] (R. 124, 131, 133-34, 233-37) On April 21, 2005, Thomas flipped an all-terrain vehicle ("ATV"), injuring his chest. (R. 315-16)

Thomas' vision problems resulted from the impact of a thrown beer bottle which occurred in 1997 while he was working as a bouncer. (R. 505) Because of this trauma to his right eye, Thomas had a detached retina and traumatic glaucoma surgery at Wake Forest Medical Center in 1998, (R. 219), and additional eye surgeries in Roanoke and at Vanderbilt Medical Center in 2001, 2002 and 2005. (R. 146-47, 163, 306) Thomas is legally blind in his right eye.

On July 20, 2004, the reviewing state agency for the Social Security Administration denied Thomas' application upon initial review. (R. 15) Thomas filed an application for reconsideration on August 13, 2004, which was also denied. (R. 35) On December 7, 2004, he timely filed a request for a hearing before an ALJ. (R. 32) The requested hearing occurred on November 21, 2005, and on January 26, 2006, the ALJ issued a written opinion denying Thomas' claims. (R. 15-26) The ALJ's findings became the final decision of the Commissioner of Social Security when the Appeals Council denied review on December 8, 2006. (R. 6-9)

The ALJ first found that Thomas met the insured status requirements of the Act through December 31, 2005. (R. 17) Additionally, the ALJ found that Thomas had not engaged in substantial gainful activity at any time relevant to the decision. (R. 17) The ALJ determined that Thomas suffered from severe impairments including vision problems with blindness in the right

---

[1] Thomas' medical records are replete with references to excessive alcohol consumption and abuse. (R. 234, 238-39, 244, 519) Indeed, the medical records reflect that the motorcycle accident occurred after Thomas consumed a large quantity of alcohol. (R. 238)

4

eye, left arm problems with myofascial pain syndrome and brachial plexopathy,[2] and depression. (R. 17) In addition to his physical ailments, the ALJ found that Thomas has a long history of excessive alcohol abuse. (R. 17) The ALJ held that, despite Thomas' claims, Thomas did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R 404, Subpart P, Appendix 1, Regulations No. 4. (R. 18) Finally, the ALJ found that Thomas had the residual functional capacity ("RFC") to perform light work on a sustained basis and that he was not disabled as defined in the Act. (R. 20, 26) See 20 C.F.R. §§ 404.1520(g) and 416.920(g).

The decision of the Commissioner was made at the fifth step of the sequential evaluation process. Based on the objective medical findings and subjective opinions of treating, examining, and evaluating physicians, the Medical-Vocational grids, Thomas' past work and daily activities, and an assessment of his credibility, the ALJ agreed with the State Agency's assessment that Thomas retained the residual functional capacity to perform a range of light work. (R. 20)

In his brief before this court, Thomas presents four arguments seeking to establish that the ALJ's decision was not supported by substantial evidence. Thomas first argues that the ALJ's decision is not supported by substantial evidence and must be reversed because the ALJ accorded little weight to the opinion of Thomas' treating physical medicine doctor, Dr. Ralph Brown. In a questionnaire format, Dr. Brown opined that Thomas was limited to sitting or standing/walking for two hours per day and that Thomas' ailments would produce frequent work absenteeism and require multiple breaks during the workday making any permanent employment unrealistic.

---

[2] Brachial plexopathy is any neuropathy of the brachial plexus, that being the bundle of nerves connecting the cervical spine to the arm. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1453 (Douglas M. Anderson, ed., Saunders 2003).

5

(R. 425-26) Second, Thomas argues that the combination of his myriad ailments prevents him from performing substantial gainful activity. Third, regarding residual functional capacity, the ALJ held that Thomas retains the capacity to perform light work, given his injuries, at a "relatively low stress simple job." (R. 20) Thomas maintains that this finding is exceedingly vague and obscures Thomas' true residual functional capacity. Fourth, Thomas argues that the Appeals Council failed to effectively consider medical evidence submitted before denying review of his claim. (R. 6-9)

### III.

Thomas argues that a significant impairment to his left shoulder and arm precludes him from performing substantial gainful activity. In support of his argument, he cites a questionnaire in which Dr. Brown opined that Thomas experienced pain in his left upper extremity. (R. 425) At the November 21, 2005 administrative hearing, the Vocational Expert ("VE") remarked that if Thomas' left arm was nearly useless and could only be used minimally on the job, Thomas could not perform the jobs the VE identified. (R. 524-25) Thomas argues that this testimony, coupled with Dr. Brown's assessment regarding the significant limitations in the left arm, supports a finding of disability. Review of the medical records concerning the left arm, however, does not support the premise of the question posed to the VE that Thomas' left arm was nearly useless.

Following the 2000 motorcycle accident, Dr. Salvatore Barranco treated Thomas for a number of his injuries including carpal tunnel syndrome in his left hand, wrist pain, and pain associated with a damaged rotator cuff. (R. 126-27, 145) After various treatments, Dr. Barranco noted Thomas' improvement. On August 22, 2000, Dr. Barranco remarked that Thomas was "doing well . . . has better shoulder motion . . . [and] has gained some muscle strength back." (R. 145) On September 21, 2000, Dr. Barranco stated that Thomas was "doing well" in reference

6

to his damaged wrist. (R. 145) Finally, after a few more treatments and referrals to other physicians, on May 14, 2001, Dr. Barranco opined that Thomas was "doing quite well . . . [with a] marked return of his rotator cuff function . . . [and] excellent motion of the wrist with no discomfort." (R. 143) Based on his demonstrated progress, Dr. Barranco okayed Thomas to return to full work activities. (R. 143)

There are no medical records in the record reflecting any complaints by Thomas of neck, arm or shoulder problems during 2002 and 2003.

Shortly before his disability application was filed in 2004, however, Thomas visited his family doctor, Scott A. Kincaid, complaining of pain in his left shoulder, scapula and upper arm. Dr. Kincaid's physical examination on January 14, 2004 noted that "[h]e does have some weakness to most of the muscles of the neck, shoulder, and arm, but the effort is inconsistent." (R. 278) Dr. Kincaid told Thomas that he had "some rehab potential," but noted that he had no insurance to pay for physical therapy as "[h]e is not working, or apparently looking for work." (R. 279). Dr. Kincaid referred Thomas to Dr. Scott Urch, an orthopedist, and his referral letter of January 14, 2004 is rather telling. In that letter, Dr. Kincaid writes "I got the impression that the main reason he is here is to seek disability, rather than pain control, and while he does have some rehab potential, I doubt he will ever be back to normal." (R. 277)

Dr. Scott Urch examined Thomas on February 9, 2004 for left shoulder pain and decreased range of motion. (R. 283-84) On physical examination, Dr. Urch did not observe a great deal of atrophy and only minimal tenderness in Thomas' shoulder. Dr. Urch noted 4+/5 strength "in forward elevation, abduction, external and internal rotation, pretty symmetrically when compared to the opposite side." Dr. Urch noted that Thomas "has a normal cervical spine exam and a normal neurologic exam with no significant muscle weakness noted in his upper

extremities." (R. 284) Dr. Urch told Thomas that he did "not want to get involved in a disability issue with him," and doubted Thomas' assertion that Dr. Jackson told Thomas not to exercise his shoulder. Dr. Urch wrote: "I think he would absolutely benefit by continuing some exercises, however he states that Dr. Jackson told him not to do any exercises about his shoulder. I would really like to see Dr. Jackson's notes." (R. 284) Dr. Urch felt that there was no benefit to be obtained by Thomas from any surgery, and recommended management through an exercise program and some injections and medication. (R. 284)

In fact, Thomas had been seen by Dr. Jackson, a neurologist, a few days earlier, on February 5, 2004. Dr. Jackson's physical examination notes reflect that his neck and shoulder range of motion were normal, there was no atrophy or twitching, and muscle tone was normal. Gait was normal. There was a slight decrease in grip strength. (R. 230-31) Dr. Jackson summarized that Thomas' "neurological examination reveals mild residual weakness in the C5 distribution without significant atrophy, without reflex change, and without swelling or trophic changes of the distal upper extremity. . . . He exhibits frequent pain related behavior with groaning, grimacing, and splinitng, but on the other hand has normal range of motion of the cervical spine and shoulder." (R. 231) Dr. Jackson noted that an EMG of the left upper extremity was "much improved" from the one done in October, 2000. There is no mention in Dr. Jackson's note discouraging exercise.

Thomas' left arm not only showed improvement, but the medical evidence indicates that Thomas may have been less than forthcoming regarding the severity of his impairments. In his decision, the ALJ stated that Thomas' arguments concerning his left arm were not credible:

> I note that he has gone for long periods of time without treatment for
> his left upper extremity complaints while alleging constant pain and
> little or no functional use of his arm. I do not believe that he would

8

> have the pain he complained of and the limitations he alleges and not have sought medical treatment. When he did return for medical evaluation, his purpose appeared to be to obtain disability benefits rather than to obtain relief from his complaints . . . [h]e does not appear to have been honest with his medical sources as to his actual symptoms and limitations or as to findings from other physicians.

(R. 22) The ALJ also stated that "the claimant's statements concerning, the intensity, duration, and limiting effects of these symptoms are generally not credible." (R. 22)

In assessing the credibility of Thomas' assertion that his left arm was essentially non-functional, the ALJ considered the fact that Thomas was injured in 2005 riding a four wheel ATV and that during 2002 and part of 2003 Thomas completed a ten month course on autobody repair and worked in such a job for four months. The ALJ's observation that such activities rendered incredible the severity of Thomas' left arm impairment is persuasive.

On the issue of the functional limitations associated with his neck, arm and shoulder problems, Thomas' appeal relies principally on the questionnaire response of Dr. Brown. At the time the ALJ rendered his decision, the record contained only one medical record from Dr. Brown concerning Thomas' visit to Dr. Brown on August 22, 2005. (R. 338-341) In the record of that visit, Dr. Brown's physical examination noted that Thomas was mildly obese, his neck was tender with trigger points on his left shoulder blade and trapezius muscle, his back was tender with a lumber paraspinal trigger point around L4, he had numbness in his left shoulder and left medial foot, all reflexes were diminished and decreased left grip strength. (R. 340) Dr. Brown's note includes a reference to "Motor Function: left, hand," but no further explanation was provided. (R. 340) In his impression, Dr. Brown noted that the "primary pain generator today is myofascial pain in the neck, next is combo of tibial nerve and brachial plexopathy." (R. 340)

9

Three months later, on November 28, 2005, Dr. Brown responded to a questionnaire prepared by Thomas' attorney.[3] Within this questionnaire, Dr. Brown was presented with various questions regarding Thomas' capacity to work. In the questionnaire Dr. Brown estimated that he could only sit or stand/walk less than two hours in an eight hour day. (R. 425) When asked to estimate how often Thomas would likely be absent from work as a result of his impairments, Dr. Brown checked a box marked "more than four times a month." (R. 426) In response to the question asking how many breaks Thomas would require during a normal eight-hour workday, Dr. Brown checked the box marked "more than three times a day." (R. 426) Thomas argues that this questionnaire establishes his disability and that the ALJ erred by affording little weight to Dr. Brown's opinions reflected in it.

As the ALJ correctly recognized, (R. 23), there is nothing in Dr. Brown's treatment records to support the extreme limitation on sitting, standing and walking, absenteeism or breaks set forth in his questionnaire response. At the time Dr. Brown answered the questionnaire, he had seen Thomas on two occasions, primarily for pain in his neck and left arm and shoulder, (R 288, 486), and there is very little in this treatment records that could support the extreme limitation on sitting, standing, walking or even hint at required breaks or absenteeism. As such, the ALJ was plainly correct to accord it little weight.

The record contains substantial evidence to support the ALJ's finding that Thomas' left arm impairment would not prevent him from obtaining substantial gainful employment. The ALJ's RFC assessment was well grounded in the treating medical records and the RFC assessment done by the State Agency physicians. (R. 247-55) The medical records in this case

---

[3] The office notes concerning Thomas' visit to see Dr. Brown on November 28, 2005, were not part of the record before the ALJ, but were submitted to the Appeals Council.

10

describe a patient with a traumatic shoulder and arm injury which was treated by a number of doctors who noted that his arm problems improved over time and which do not support Thomas' argument that his left arm was nearly useless. Accordingly, the ALJ's findings regarding Thomas' left arm were supported by substantial evidence.

## IV.

Thomas suffered a detached retina in his right eye in 1997 when he was hit with a beer bottle, and has had multiple treatment and surgeries to that eye since that time. Thomas testified that he had eight eye surgeries and sees only light and shapes with is right eye. (R. 506-08) Several doctors noted that Thomas is blind in his right eye, which is not in dispute. The issue on this appeal concerns whether Thomas established that he is disabled from all work due to diplopia,[4] or double vision, in his good, left eye since the 1997 trauma to his right eye. In his brief, Thomas argues that the vocational expert testified that if Thomas indeed suffered from diplopia, he would be unable to work. (R. 525) Thomas then points to the ALJ's finding that Thomas has suffered from double vision, (R. 21), arguing that disability is thereby established.

After the 1997 injury, Thomas sought medical treatment and underwent a number of surgical procedures to improve his vision. (R.170-224) Following the initial detached retina surgery, Thomas was treated for increased intraocular pressure associated with traumatic glaucoma as well as a cataract and ptosis.[5] As the ALJ aptly noted, and as careful review of the

---

[4] Diplopia, also known as double vision, is defined as "the perception of two images of a single object." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 525 (Douglas M. Anderson, ed., Saunders 2003).

[5] Ptosis is a condition characterized by "drooping of the upper eyelid from paralysis of the third nerve or from sympathetic innervation." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1542 (Douglas M. Anderson, ed., Saunders 2003).

11

many medical records concerning his eye condition confirms, Thomas made no complaint concerning double vision until May, 2005. (R. 25, 297) The medical records in the preceding years make no reference to double vision whatsoever and focus largely pain from eye pressure due to glaucoma. Rather than mention any problem with double vision, many of these records recite that he had no new eye problems. (R. 187, 199, 202, 208) Thomas' eye records make no mention of any vision problem with his left eye. For example, in an examination on September 24, 2004, it was noted that his left eye was normal with a normal visual field. (R. 291)

Thomas did complain of double vision beginning in May, 2005, but that problem appears short-lived. Thomas was referred to Dr. John Facciani for strabismus surgery the next month and successful surgery was performed on June 9, 2005. Dr. Facciani's treatment record from July 19, 2005 notes that Thomas' reported that his double vision "is significantly better (now very infrequent) after surgery. He is most likely to see double vision after he drinks alcohol." (R. 305-06) Subsequent reports in the ensuing months confirmed that Thomas was doing well. (R. 310-11) Eye records from the following winter make no mention of double vision. (R. 465-67) The ALJ's conclusion that any impairment posed by double vision lasted less than one year, (R. 25), is well supported by scrupulous review of Thomas' voluminous eye records. Because the records reflect that Thomas' complaints concerning double vision were so short lived, the ALJ was correct to conclude that it provides no basis for disability.

V.

Thomas additionally asserts that the combination of his myriad ailments prevents him from performing substantial gainful activity. The record reflects that Thomas was injured by the beer bottle in 1997 and in the motorcycle wreck in 2000, the ATV wreck in 2005, and that he has had substantial medical treatment as a result. The ALJ considered in great detail all of Thomas'

12

impairments as a result of these accidents and substantial evidence supports his conclusion that Thomas is not disabled from all work. Even considering his pain and various complaints in the aggregate, substantial evidence supports the ALJ's decision that Thomas retains the RFC to perform light work. The ALJ weighed all of Thomas' impairments in determining that he did not qualify for benefits, and his decision is well supported in the record.

## VI.

Regarding the ALJ's finding that Thomas could perform a "relatively low stress simple job," Thomas argues that this determination is vague and leaves unspecified the precise extent of his mental limitations. (R. 20) However, the record does not reflect any treatment or evaluation for a mental impairment whatsoever. The state agency had Thomas evaluated by Dr. Jerome Nichols, Ph.D., on June 30, 2004 concerning his mental status. Testing established his full scale IQ at 94 and current GAF at 60. Dr. Nichols noted no psychotic disorder and his mental status was normal other than complaints of physical pain which caused him to be unhappy. Thomas was annoyed at having to attend the evaluation and downplayed any psychological issues. Dr. Nichols' diagnostic impression was of depression, but noted that Thomas was poorly motivated for any treatment of this condition. (R. 245) As to employment issues, Dr. Nichols wrote:

> The claimant is able to do detailed and complex tasks. He could maintain regular attendance in the workplace. His ability to perform work activities on a consistent and timely basis is not impaired. He would not require special or additional supervision to perform most work activities. His mental disorder would not cause interruptions in a normal work day or work week. He is able to accept instructions from supervisors. There appears to be minor problems interacting with co-workers and the public. There seems to be moderate problems in dealing with the usual stresses encountered in competitive work.

13

(R. 246) Confirmation of Dr. Nichols' assessment that Thomas was capable of working is reflected in the Psychiatric Review Technique completed by Dr. E. Hugh Tenison, Ph.D., on July 16, 2004, which notes no severe mental impairment and only mild limitations in Thomas' daily activities or maintaining concentration, persistent or pace. (R. 266) Given these assessments, the ALJ's inclusion in Thomas' RFC of a mild limitation due to depression is appropriate. As such, the ALJ's decision in this regard is supported by substantial evidence.

## VII.

Finally, Thomas argues that the Appeals Council failed to effectively consider medical evidence submitted before denying review of his claim. When a claimant seeks review by the Appeals Council, the Council first makes a procedural decision to either grant or deny review. If the Appeals Council denies review, as in the instant matter, the denial renders final the decision of the ALJ. It is thus the decision of the ALJ, and not the procedural decision of the Appeals Council to deny review, that is subject to judicial scrutiny. See 20 C.F.R. §§ 494.967-981, 416.1467-1481.

The Appeals Council must consider evidence submitted to it when it is deciding whether to grant review "if the additional evidence is (a) new, (b) material, and (c) relates to the period on or before the date of the ALJ's decision." Wilkins v. Dep't of Health and Human Servs., 953 F.2d 93, 95-96 (4th Cir. 1991). Evidence is new if it is not duplicative or cumulative. Id. at 96. Evidence is material "if there is a reasonable possibility that the new evidence would have changed the outcome." Id. Where the Appeals Council accepted the new evidence, but denied review, the Fourth Circuit requires that reviewing courts consider the record as a whole, including the new evidence, in order to determine whether the decision of the ALJ is supported by substantial evidence. Id.

14

Pursuant to Wilkins, when the Appeals Council fails to provide an explanation for its consideration of additional evidence, reviewing courts should determine whether the additional evidence creates a conflict, is contradictory, or calls into doubt any decision grounded in prior medical reports. See Davis v. Barnhart, 392 F. Supp. 2d 747, 751 (W.D. Va. 2005). If the new evidence creates a conflict, is contradictory, or calls into doubt any decision grounded in prior medical reports, the case must be remanded to the Commissioner to weigh and resolve the conflicting evidence. If not, the case can be decided on the existing record without the necessity of a remand.

In the instant matter, the Appeals Council considered the new evidence, but failed to provide an explanation for its consideration of the reviewing evidence. (R. 9) Therefore, this court must determine whether the evidence creates a conflict, is contradictory, or calls into doubt any decision grounded in prior medical reports. The additional evidence consists of diagnostic studies and reports from Drs. Kincaid, Brown and Grubb. (R. 473-98)

Thomas submitted to the Appeals Council certain medical records from Dr. Kincaid, an opthamologist at Vistar Eye Center. The earliest note submitted to the Appeals Council, concerning Thomas' visit on July 19, 2005, where he reported that following his strabismus surgery, he was happier than he had been in four years because of decreased double vision, (R. 472), was in the record reviewed by the ALJ, (R. 305), and thus is not new. Nor does it, on its face, contradict or call into doubt the ALJ's consideration of the impairment posed by Thomas' eye problems. The other records submitted to the Appeals Council consist of subsequent visits to Vistar on December 19, 2005, January 31, 2006 and April 3, 2006, but none of those records even mention double vision. Rather, these records concern traumatic glaucoma and a drooping right eyelid, and note that his condition appeared about the same as previously

15

reported. (R. 465-67) As such, there is nothing in these records submitted to the Appeals Council concerning Thomas' eye condition that contradicts or calls into doubt the decision of the ALJ warranting any further administrative examination of these records.

The records from Dr. Brown range from November 28, 2005 through August 2, 2006. (R. 473-95) On November 28, 2005, Thomas was seen to follow up chronic problems with his left wrist and hand, left foot and neck. On physical examination, Dr. Brown noted that Thomas had a "very weak left arm but no real atrophy noted today, trigger finger on left hand" and numbness only in the left foot. (R. 485) Dr. Brown's impression was identical to that of his August, 2005 visit except that he added a trigger finger and noted that the "meds are helping but not lasting long enough." (R. 486) Dr. Brown increased the frequency of his pain medication and scheduled a return visit in three months. Medical records of visits by Thomas to Dr. Brown on February 27, April 13, and June 5, 2006 were included in the materials submitted to the Appeals Council. By and large, these records reflect unchanged complaints of neck and left shoulder and arm pain, with some reference that there was deterioration in the condition of his low back with radiating pain and increasing problems with sleep. (R. 477, 482, 488) Following the February 2006 visit, Dr. Brown ordered an MRI of his neck and low back and nerve conduction studies. The cervical MRI showed "slight nonsignificant bulging of disk at C5-C6-C7 intervertebral levels. Otherwise negative examination." (R. 474) The MRI of the low back showed mild to moderate "[d]egenerative disc desiccation at L4-5-S1 intevertebral levels . . . without causing any neural or spinal canal stenosis."[6] (R. 479) These studies are consistent with

---

[6]Spinal stenosis is narrowing of the vertebral canal, nerve root canals, or intervertebral foramina of the lumbar spine caused by encroachment of bone upon the space. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1758 (Douglas M. Anderson, ed., Saunders 2003)

16

Case 7:07-cv-00059-mfu   Document 18   Filed 03/18/08   Page 16 of 19   Pageid#: 99

imaging done on Thomas at the time of his ATV wreck a year earlier on April 21, 2005, where it was reported "[t]here are some mild degenerative changes in the spine." (R. 328) The EMG reports that the "Electrodiagnostic Evidence seems to support at least an S1 but in combination with clinical eval also suggest the possibility of an L5 Radiculopathy in the Left Lower Extremity,"mild carpal tunnel syndrome in the left wrist and a chronic brachial plexopathy "that has likely gotten much better." (R. 493) In a letter written on August 2, 2006, Dr. Brown mentioned only the lumbar radiculopathy, concluding that "I consider him disabled from this condition which we are still attempting to get treated. It is permanent unless it can be definitively treated which may not happen due to the nature of the mismatch between his EMG findings and his MRI findings which is more than the scope of this letter." (R. 473)

Nothing in the medical records presented to the Appeals Council concerning Thomas' chronic brachial plexopathy problem with his left arm and shoulder are conflicting, contradictory or call into doubt the ALJ's decision. Curiously, Dr Brown's letter of August 2, 2006, contrasts rather strikingly with his November 28, 2005 questionnaire in that his August, 2006 letter does not even mention the earlier issues concerning Thomas' left shoulder and arm, but rather focuses exclusively on a pinched and irritated nerve in his low back, which was not claimed by Thomas to be a basis for his disability application and was not even mentioned in Thomas' medical records until after the ALJ's opinion. While the 2006 medical records from Dr. Brown mention Thomas' low back, neither they nor the diagnostic testing done in 2006 support a finding of disability. As such, there is no basis for reversal or remand based on Dr. Brown's 2006 records.

Finally, the record contains a record of an initial evaluation of Thomas by Dr. Stephen A. Grubb, an orthopedist, on July 19, 2006. (R. 494-98) Dr. Grubb saw Thomas on referral from Dr. Brown, principally for his low back pain. (R. 494) Within his report, Dr. Grubb remarks that

17

Thomas' symptoms include lower back pain, glaucoma, hypertension, painful joints, and numbness and tingling in both feet and his right thigh. (R. 494-98) Dr. Grubb's examination of Thomas revealed that he had "mild right shoulder elevation and loss of right flank. Patient walked with left antalgic gait, wide based gait. The patient was able to toe walk. Tandem walking was slightly unsteady." (R. 496) Thomas' flexion was limited by low back pain, lateral bending caused low back pain, and he experienced low back tenderness and decreased sensation in his left foot. (R. 497) Dr. Grubb noted that straight leg raises at 90 degrees did not produce any pain. (R. 497) Dr. Grubb diagnosed cervical and lumbar degenerative disc disease and discogenic pain and recommended physical therapy. (R. 497-98) Dr. Grubb's notes do not reflect any opinion regarding disability or occupational limitations and there is nothing in the record of this one visit to suggest that Thomas had a disabling back condition requiring remand of this case for further administrative evaluation.

Considering all of the evidence submitted to the Appeals Council, it does not meet the Wilkins standard. As such, this new evidence does not warrant remand or reversal of this case.

## VIII.

Considering the evidence in the administrative record as a whole, the court finds that the Commissioner's decision meets the substantial evidence standard. Again, it is not the province of the court to make disability determinations or to re-weigh the evidence in this case; rather, the court's role is to decide whether the Commissioner's decision is supported by substantial evidence. It is clear to the court that the accumulated medical evidence in the record supports the ALJ's findings. This court finds that the ALJ's decision was founded on substantial evidence.

In affirming the final decision of the Commissioner, the court does not suggest that Thomas remains free from pain and subjective discomfort. On the contrary, the record indicates

18

that Thomas suffers from a variety of bothersome ailments. However, the objective medical record simply fails to document the existence of any condition which would reasonably be expected to result in total disability from all forms of substantial gainful employment. It appears to this court that the ALJ properly considered all of the objective and subjective evidence in adjudicating Thomas' claims for benefits. It follows that all facets of the Commissioner's decision in this case are supported by substantial evidence. Defendant's motion for summary judgment must be granted.

    The Clerk of the Court is hereby directed to send a certified copy of this Memorandum Opinion and the accompanying Order to plaintiff and counsel of record for the defendant.

    Enter this 18th day of March, 2008

/s/ Michael F. Urbanski
Hon. Michael F. Urbanski
United States Magistrate Judge

19

Case 7:07-cv-00059-mfu   Document 18   Filed 03/18/08   Page 19 of 19   Pageid#: 102